Graeme T. SMITH, Respondent,

v.

**DIRECTOR OF REVENUE, Appellant.**

No. WD 68356.

Missouri Court of Appeals,
Western District.

May 6, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 1, 2008.

Application for Transfer Denied Aug. 26, 2008.

indicated in the court's order.

---

4. Pursuant to Rule 67.03, an involuntary dismissal is without prejudice unless otherwise

Nicole Loethen, Jefferson City, MO, for appellant.

John Allbright, Poplar Bluff, MO, for respondent.

Before PAUL M. SPINDEN, P.J., JAMES EDWARD WELSH, and ALOK AHUJA, JJ.

JAMES EDWARD WELSH, Judge.

The Director of Revenue appeals the circuit court's judgment setting aside the Director's suspension of Graeme T. Smith's driving license for driving while intoxicated. The circuit court found that the Director did not establish that the arresting officer had probable cause to believe that Smith had committed an alcohol related traffic offense prior to his arrest. The Director contends that the circuit court's judgment is unsupported by substantial evidence, is against the weight of the evidence, and misapplies the law.

We disagree and affirm the circuit court's judgment.

The evidence established that on the morning of July 15, 2006, at 7:56 A.M., University of Missouri Police Department Officer Sam Easley saw an Oldsmobile Alero, driven by Smith, make a "lane violation" on Rock Quarry Road in Columbia, Missouri. Easley began following the vehicle and noticed that the vehicle's registration had expired. Easley then stopped the Oldsmobile on the side of the road.

When Easley approached the vehicle, he smelled a strong odor of intoxicants. Besides Smith, Drew Hill was also in the car. Easley testified at the trial that the odor of alcohol was coming from the vehicle and from Smith. On the Alcohol Influence Report, Easley marked the box which said that the odor of alcoholic beverage emanating from Smith's breath was strong, but, in his written narrative of the incident, Easley merely said that he noticed a strong odor of intoxicants coming from the vehicle. Easley also noticed that Smith's eyes were bloodshot and glassy and that his pupils were dilated. Easley asked Smith for his driving license, and Smith produced the license without difficulty.

Easley returned to his patrol car and then approached the Oldsmobile for a second time. Easley asked Smith to get out of the car, and Smith had no difficulty exiting the vehicle. Easley then asked Smith how much he had been drinking. Smith told Easley that, the night before, he drank three drinks per hour over a four hour span but that he had been sleeping for five to six hours at a friend's house.[1] Smith told Easley that he was driving that morning to pick up his car, which he had left in downtown Columbia.

Easley then had Smith perform several field sobriety tests. First, Easley asked Smith to submit to the Horizontal Gaze Nystagmus (HGN) test. Before beginning the test, Easley turned Smith toward the direction of the sun. During the test, Smith complained about the sun shining into his eyes. Easley stopped the test, had Smith to turn and face away from the sun, and started the test again. From the test, Easley determined that Smith exhibited all six clues of intoxication. According to Easley, four or more clues on a HGN test indicate intoxication. Easley acknowledged, however, that there were "a lot" of types of non-alcohol nystagmus and that he could not determine whether the results of a HGN test are alcohol or non-alcohol induced. Smith testified that he had slept with his contact lenses in, that his eyes were itchy, red, and uncomfortable, and that he had difficulty keeping his eyes open. He also said that, when Easley administered the HGN test, he could still see sunspots and that he could see sunspots for almost the entirety of the test.

Next, Easley asked Smith to perform the walk and turn test. During this test, Easley observed two clues of impairment. Smith raised his arms six inches from his sides, and he made an improper turn by not taking small steps with his right foot when he made his turn. Easley said that, although he was "not completely sure," he believed for the walk and turn test that four or more clues indicated possible impairment.

For the third field sobriety test, Easley asked Smith to perform the one leg stand test. During this test, Easley noticed two clues that indicated impairment. According to Easley, Smith swayed slightly to

---

1. Smith testified that he left downtown Columbia around 1:45 A.M. and went to a friend's house to sleep for five to six hours.

moderately from side to side, and Smith hopped two times on the count of 1003.[2]

Easley then asked Smith to perform the alphabet test by reciting the alphabet from D through M. Smith performed this test correctly. Easley also asked Smith to perform the counting backward test by counting from 64 to 43. Smith also performed this test correctly.

For the sixth field sobriety test, Easley conducted a Preliminary Breath Test (PBT). Easley's dashboard video of the stop, which had partial audio and was introduced into evidence, shows that Easley contacted the dispatch to request that an older version of the PBT machine be brought to him. An officer arrived shortly thereafter with a PBT machine, but Easley noted that it was a new machine and that he had never used the new type of machine before. He then radioed the dispatch to ask for instructions. Easley attempted to administer the test to Smith, but then used his police radio to ask another officer to come to the scene and administer the test.

At trial, Easley testified that the PBT indicated that Smith's blood alcohol content level was above .08 percent. After Easley testified about the results of the PBT, Smith asked Easley whether he administered the PBT to Smith. Easley said that he did not, and Smith objected to Easley's testifying about a test which someone else administered. The circuit court sustained Smith's objection.

Easley said that, based upon his training and experience, he formed the opinion that Smith was intoxicated and arrested Smith for driving while intoxicated. Easley then drove Smith to the University Police Department. At the police department, Eas-ley informed Smith of his *Miranda* rights [3] and the implied consent law. Smith then consented to a chemical test of his breath for blood alcohol. The breathalyzer test indicated that Smith's blood alcohol concentration was .136 percent.

Easley issued a citation to Smith for violating a city ordinance for driving while intoxicated. Smith also, acting on behalf of the Director of Revenue, served Smith with notice of suspension of his driving privileges for "driving a vehicle while [his] blood alcohol level was over the legal limit." The Director held an administrative hearing on the suspension of Smith's driving license on September 26, 2006. On October 10, 2006, the Director sustained the suspension of Smith's license. Smith filed a petition for a trial de novo with the circuit court, and the circuit court set aside the Director's suspension of Smith's driving license. The circuit court found that, "based upon the credible evidence ... the arresting officer did not have probable cause to believe that [Smith] had committed an alcohol related traffic offense on [July 16, 2006]." The Director appeals the circuit court's judgment to this court.

■ In its appeal, the Director asserts that the circuit court's determination that the arresting officer did not have probable cause to believe that Smith had committed an alcohol related traffic offense is unsupported by substantial evidence, is against the weight of the evidence, and misapplies the law. We disagree.

■ We must affirm the circuit court's judgment unless it is not supported by substantial evidence, is against the weight of evidence, or erroneously declares or applies the law. *Murphy v. Carron,*

---

**2.** For the one leg test, Easley instructed Smith to raise his foot six inches off the ground, to point his toe, and to count from 1000 to 1030.

**3.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

536 S.W.2d 30, 32 (Mo. banc 1976); *Verdoorn v. Dir. of Revenue*, 119 S.W.3d 543, 545 (Mo. banc 2003). "We accept as true all evidence and inferences in favor of the prevailing party and disregard contrary evidence." *White v. Dir. of Revenue*, 227 S.W.3d 532, 534 (Mo.App.2007). "If the facts of a case are contested, then this Court defers to the trial court's determinations regarding those facts." *Guhr v. Dir. of Revenue*, 228 S.W.3d 581, 585 n. 3 (Mo. banc 2007). If the facts are not contested then, as in any other civil case, "the issue is solely legal and there are no findings of fact for the appellate court to defer to." *Furne v. Dir. of Revenue*, 238 S.W.3d 177, 180 (Mo.App.2007); *Guhr*, 228 S.W.3d at 585 n. 3. " '[T]he trier of facts,' " however, " 'has the right to disbelieve evidence, even when it is not contradicted.' " *Guhr*, 228 S.W.3d at 585 n. 3 (citation omitted).

■ To establish a prima facie case for driving while intoxicated, the Director's burden was to establish by a preponderance of the evidence that the arresting officer had probable cause to arrest Smith and that Smith's blood alcohol concentration was at least .08 percent by weight. § 302.505.1, RSMo Cum.Supp.2007; *Vanderpool v. Dir. of Revenue*, 226 S.W.3d 108, 109 (Mo. banc 2007). In regard to the probable cause necessary to suspend a driving license pursuant to section 302.505.1, the Missouri Supreme Court has said:

"The probable cause required for the suspension or revocation of a driver's license is the level of probable cause necessary to arrest a driver for an alcohol-related violation." "That level of probable cause will exist when a police officer observes an unusual or illegal operation of a motor vehicle and observes indicia of intoxication upon coming into contact with the motorist." "Probable cause, for the purposes of section 302.505, will exist when the surrounding facts and circumstances demonstrate to the senses of a reasonably prudent person that a particular offense has been or is being committed." "The level of proof necessary to show probable cause under section 302.505 is substantially less than that required to establish guilt beyond a reasonable doubt." "The trial court must assess the facts by viewing the situation as it would have appeared to a prudent, cautious, and trained police officer."

*York v. Dir. of Revenue*, 186 S.W.3d 267, 270 (Mo. banc 2006) (citations and footnotes omitted).

The Director asserts that Easley's knowledge of the facts before the arrest warrants a prudent belief that Smith was driving while intoxicated. In making his argument, the Director contends that we need not give any deference to the circuit court's judgment finding that, "based upon the credible evidence," the arresting officer did not have probable cause to believe that Smith had committed an alcohol related traffic offense. The Director's contention, however, is clearly against the Missouri Supreme Court's decisions in *York v. Director of Revenue*, 186 S.W.3d 267 (Mo. banc 2006), and *Guhr v. Director of Revenue*, 228 S.W.3d 581 (Mo. banc 2007). *See also Furne*, 238 S.W.3d at 180.

In *York*, the Supreme Court found that, even though the evidence regarding the indicia of intoxication was uncontroverted, the circuit court, "in its discretion, was free to draw the conclusion that there was no probable cause based upon its assessment of [the] evidence and the officer's own equivocation of the existence of probable cause." *York*, 186 S.W.3d at 272. The Court, therefore, deferred to the circuit court's finding even though considering uncontroverted evidence. *Furne*, 238 S.W.3d at 180.

In *Guhr*, the Missouri Supreme Court specifically said that where the facts of a case are contested, this court must defer to the circuit court's determination regarding those facts. *Guhr*, 228 S.W.3d at 585 n. 3; *see also Furne*, 238 S.W.3d at 180. Moreover, the Supreme Court reaffirmed the principle that " 'the trier of facts has the right to disbelieve evidence, even when it is not contradicted.' " *Guhr*, 228 S.W.3d at 585 n. 3 (citation omitted); *Furne*, 238 S.W.3d at 180. Therefore, as this court concluded in *Furne*:

> As *Guhr* makes clear, the trial court is free to disbelieve even uncontradicted evidence and testimony, and it is only where the facts are uncontested, and not where the evidence is not contradicted, where no deference is due to the trial court. *Guhr*, 228 S.W.3d at 585 n. 3. Thus, even where the evidence is not contradicted, unless the facts of the case are not contested in any way, this Court must give deference to the trial court's determination as to whether the evidence established reasonable cause to believe the individual whose license was revoked was driving while intoxicated. *Id.; York*, 186 S.W.3d at 272.

*Furne*, 238 S.W.3d at 181.

The Director relies on the testimony of Easley to establish probable cause. In particular, the Director claims that the evidence showed:

(1) Smith's blood alcohol content was .136%;[4]

(2) the car Smith was driving crossed over the double yellow center lines of the highway;

(3) a strong odor of alcohol came from Smith's car and his breath;

(4) Smith's eyes were bloodshot and glassy and his pupils were dilated;

(5) Smith admitted to drinking 3 drinks per hour over a 4 hour period and then sleeping 4 1/2 hours;

(6) Smith exhibited clues of intoxication on three field sobriety tests; and

(7) Smith tested above .08% on two preliminary breath tests administered by different police officers.[5]

Smith, however, did not concede all of these facts. Indeed, he contested the Director's evidence by cross-examining Easley, by his own testimony offered during cross-examination,[6] by presenting the testimony of his friend who was in the car with him when he was pulled over by Easley, and by offering Easley's dashboard video of the entire incident.[7]

On cross-examination, Easley acknowledged that he should never administer the HGN test with a person looking into the sun and acknowledged that the sun could affect a person's eyes. The dashboard video of the stop, however, shows Easley turning Smith directly into the sun to attempt to perform the first HGN test. Easley also acknowledged that there were

---

**4.** This fact, of course, was not known until after Smith's arrest and could be not used by Easley in determining probable cause for the arrest.

**5.** Contrary to what the Director contends, Easley did not testify about the results of the PBT that he administered to Smith. Although Easley testified that the PBT indicated that Smith's blood alcohol content level was above .08 percent, Easley said that he did not administer the test, and the circuit court sustained Smith's objection to Easley's testifying

about a test which someone else administered.

**6.** As this is a civil action, the Director called Smith as a witness in the Director's case in chief.

**7.** The entirety of the stop was available to the circuit court. All of the field sobriety tests were clearly visible, and some of the audio of the interaction was comprehensible.

"a lot" of types of non-alcohol nystagmus and that he could not determine whether the results of a HGN test were alcohol or non-alcohol induced. On the one leg test, Easley said that Smith hopped at the beginning of the test but then admitted that he went on from there for 30 seconds. Easley acknowledge that Smith passed the alphabet test and the counting backwards test. Although Easley noted two clues of impairment on the walk and turn test, he said that he would not consider two clues as passing or failing. On direct-examination Easley even said that, although he was "not completely sure," he believed for the walk and turn test that four or more clues indicated possible impairment. Moreover, the circuit court had an opportunity to observe the entirety of the stop and the administration of all the sobriety tests through Easley's dashboard video.

Easley also testified that Smith's speech was clear and that he was cooperative with his commands. Although on the Alcohol Influence Report Easley marked the box indicating that a strong odor of alcoholic beverage emanated from Smith's breath, in his written narrative of the incident, Easley said that he noticed a strong odor of intoxicants coming from the vehicle and did not mention Smith's breath. Moreover, Smith's friend was also in the car, and the dashboard video of the stop shows that Easley would not allow Smith's friend to drive the car after Smith was arrested, presumably because he was also intoxicated. The smell of alcohol, therefore, could have emanated from Smith's friend.

On cross-examination Smith testified that he wore contact lenses and that he was having problems with them because he was unable to take them out the night before. He said that on the morning of the incident it was difficult to keep his eyes open because his eyes were itchy and red from sleeping in his contacts. He also said that his eyes were uncomfortable. Smith also testified that, when Easley administered the HGN test the second time, he could see sunspots for almost the entirety of the test and that his eyes were itchy and uncomfortable.

Smith's friend, Drew Hill, who was riding in the car with Smith when Smith was pulled over by Easley, testified that he absolutely did not see any signs of impairment from alcohol in Smith on the morning that Smith was arrested. Hill also said that he did not see Smith violate any traffic laws when he was driving and that Smith had no trouble navigating on the road.

The circuit court in its judgment expressly found that, "based upon the credible evidence ... the arresting officer did not have probable cause to believe that [Smith] had committed an alcohol related traffic offense[.]" The circuit court, therefore, implicitly found that at least some of Easley's testimony was not credible. *See Furne*, 238 S.W.3d at 181. The circuit court "was entitled to accept or reject all, part, or none of that testimony, even if it is uncontradicted." *Id.*

As this court concluded in *Furne*, "we must defer to the trial court's credibility findings, its weighing of the evidence, and its resultant determination that the officer lacked reasonable cause to believe [Smith] was driving while intoxicated." *Id.* at 182. Although the evidence could support a different conclusion depending upon the weight given to the evidence, we defer to the circuit court's finding. *Id.* Further, neither party requested findings of fact; therefore, pursuant to Rule 73.01(c), we must consider all the factual issues to have been found by the circuit court in accordance with the result reached.

Moreover, the Director argues that the only finding that the circuit court made to which this court could defer is that its

legal conclusion of lack of probable cause is "based upon the credible evidence." The Director asserts that this bare assertion is too general to merit deference and that this court should not defer to such a non-specific credibility determination. *See Phelps v. Dir. of Revenue*, 47 S.W.3d 395, 399 (Mo.App.2001), *overruled on other grounds by Verdoorn*, 119 S.W.3d at 546, 547 appendix (when the evidence supporting revocation is uncontroverted and the circuit court has not specifically found the director's witness incredible, appellate court will not presume that the circuit court found a lack of credibility); and *Geist v. Dir. of Revenue*, 179 S.W.3d 391, 393–94 (Mo.App.2005) (the circuit court made no specific findings as to the credibility of the officer's testimony, and the appellate court would not presume that the circuit court found a lack of credibility and would not defer to the circuit court's conclusion in an uncontroverted case).

In *Furne*, this court deferred to a similar non-specific credibility finding by the circuit court. *Furne*, 238 S.W.3d at 181–82. In *Furne*, the circuit court's judgment said:

> "Upon a full consideration of the evidence adduced on the sole issue 'of whether the arresting officer had reasonable grounds to believe that Petitioner was driving a motor vehicle while in an intoxicated or drugged condition,' the Court finds the Petitioner's evidence more credible and that the Respondent has failed to meet its burden."

*Id.* at 179 n. 1. The *Furne* court concluded that the circuit court's judgment implicitly found that at least some of the officer's testimony was not credible. *Id.* at 181. The same is true for this case. The circuit court's judgment implicitly found that at least some of Easley's testimony was not credible by concluding that Easley did not have probable cause to believe that Smith

had committed an alcohol related traffic offense.

The circuit court did not err in setting aside the Director's suspension of Smith's driving license. We, therefore, affirm the circuit court's judgment.

All concur.